Filed 11/5/13  P. v. Zarate CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TOMMY PETE ZARATE,<br><br>    Defendant and Appellant. | E054970<br><br>(Super.Ct.No. INF10002307)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Mark E. Johnson, Judge. Affirmed with directions.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Steve Oetting, Michael Pulos and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I.  INTRODUCTION

Defendant Tommy Pete Zarate appeals from his conviction of being a felon in possession of a firearm (Pen. Code,[1] former § 12021, subd. (a)(1); count 1), carrying a concealed weapon (former § 12025, subd. (b)(1); count 2), and being a felon in possession of ammunition (former § 12316, subd. (b)(1); count 3), along with true findings on enhancement allegations of two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).

Defendant contends the trial court erred in (1) refusing to allow him to call a witness to testify about statements against interest made by a third party that supported the defense of third party culpability; (2) denying his motion to suppress the evidence of the firearm found in his vehicle because he had a reasonable expectation of privacy in the contents of the searched vehicle, and the scope of the search exceeded the parameters of a legitimate probation search; (3) failing to traverse the search warrant and suppress evidence of the ammunition found in his motel room because the search warrant affidavit was based on the illegally obtained evidence found in his car, or, in the alternative, he was denied effective assistance of counsel; and (4) denying the motion for a new trial based on newly discovered evidence that a third party had confessed to possessing the firearm and ammunition.  He further contends his sentence of life imprisonment was

---

[1] All further statutory references are to the Penal Code except as otherwise indicated.

cruel and unusual punishment.[2]  In a supplemental brief, he argues his sentence should be vacated and the case remanded for resentencing under recent amendments to sections 667 and 1170.12.  We agree that defendant's sentence should be vacated and the case remanded for resentencing.  We find no other error.

## II.  FACTS AND PROCEDURAL BACKGROUND

On October 22, 2010, Officer Bryan Traynham pulled defendant over because the car defendant was driving had a broken brake light.  Louie Aguilar was a front seat passenger in the car.  The officer submitted defendant's and Aguilar's information to the dispatcher and learned that Aguilar had a warrant for his arrest and was "on probation with full search terms."

Officer Traynham told defendant and Aguilar that he was going to search Aguilar and the areas of the car within his immediate control.  Defendant objected to the search. The officer searched the passenger seat, glove box, passenger side door, and center console.  In the center console, he found a loaded .357 revolver and an envelope with the name "Tommy" on it.

Defendant and Aguilar were both arrested and taken to the police station. Defendant asked if he could talk to Aguilar so they could "get their stories on the same page," or get their stories straight, but Officer Traynham did not allow it.  Defendant was later released while Aguilar remained in custody.

---

[2]  Defendant initially asserted that the judgment should be modified to award him presentence custody credits; however, he has withdrawn that contention.

3

While defendant was out of custody, he talked to Victor Diego, the manager of the motel where he lived. He told Diego the police had pulled him over and found the gun in his car. He said he was going to get another gun but could not do so legally because he had a criminal record.

Based on the gun found in defendant's car, the police obtained a search warrant for the motel room where he lived. On October 28, 2010, the officers executed the search warrant. They found a box of .357 ammunition and 17 rounds of .38 Special ammunition in the room's main dresser. They also found two boxes of 12-gauge shotgun ammunition, several boxes of nine-millimeter ammunition, one box of .22-caliber ammunition, and a .50-caliber bullet in a bag on top of a television stand. They found two documents bearing defendant's name and one document bearing Aguilar's name in the room.

Defendant was arrested for possession of ammunition. After he was given *Miranda*[3] warnings, he told the police that the ammunition found in his motel room belonged to him, but he did not know it was illegal for him to have it. He said he was the only one who lived in the motel room. The officer asked about the bullets in the gun that had been found in his car, and defendant responded that he did not want to answer because his "friend" was going to "take that charge."

Defendant testified in his own behalf. He denied making admissions to the police or making the statements to Diego. He had registered himself and his three children as

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

4

residents of the motel room, and Aguilar lived there too. He did not know that ammunition was in the dresser drawers, and the ammunition did not belong to him. The .50-caliber round found in the motel room was a souvenir dummy round he had bought at a yard sale. He also did not know that Aguilar had a gun in the car, and he had never seen the gun.

Defendant's sister and brother testified that Aguilar stayed with defendant in the motel room and kept his belongings there.

The jury found defendant guilty of being a felon in possession of a firearm (former § 12021, subd. (a)(1); count 1), carrying a concealed weapon (former § 12025, subd. (b)(1); count 2), and being a felon in possession of ammunition (former § 12316, subd. (b)(1); count 3). The trial court found true enhancement allegations of two prior strike convictions. (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).)

The trial court sentenced defendant to consecutive terms of 25 years to life for each of counts 1 and 3. The court stayed the term for count 2 under section 654.

Additional evidence is set forth in the discussion of the issues to which it pertains.

## III. DISCUSSION

### A. Exclusion of Evidence

Defendant contends the trial court erred in refusing to allow him to call a witness to testify about statements against interest made by a third party that supported the defense of third party culpability.

5

### 1. Additional Background

Aguilar invoked his Fifth Amendment privilege against self-incrimination and refused to testify. The trial court found him unavailable as a witness. The trial court then conducted a hearing under Evidence Code section 402 to determine whether defense witness Branden Mays would be permitted to testify about a conversation with Aguilar about a month before the traffic stop; defendant argued Aguilar's statements to Mays were admissible as against his penal interest under Evidence Code section 1230.

Mays testified out of the presence of the jury that he knew defendant and had known Aguilar since junior high school. A month or two before Halloween in 2010, Aguilar approached Mays at his work, said he was trying to get rid of a firearm, and asked if Mays was interested in purchasing a firearm or knew anyone else who was interested. Aguilar said the firearm was a revolver, but he did not show Mays the firearm or further describe it. Mays was not interested.

The trial court found Mays's testimony credible, but ruled that Aguilar's statements to him did not qualify as a declaration against penal interest, and Mays's testimony about Aguilar's statements was therefore inadmissible.

### 2. Analysis

"A criminal defendant may introduce evidence of third party culpability if such evidence raises a reasonable doubt as to his guilt . . . ." (*People v. Abilez* (2007) 41 Cal.4th 472, 517.) However, "to be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate . . . a reasonable doubt . . . must link the third

person either directly or circumstantially to the actual perpetration of the crime." (*People v. McWhorter* (2009) 47 Cal.4th 318, 367.)

Here, defendant's proffered evidence—statements Aguilar purportedly made to Mays—was hearsay. Defendant argues the evidence was admissible under the exception to the hearsay rule for statements against the declarant's interest. (Evid. Code, § 1230.)[4] "Whether a statement is one against penal interest is a preliminary fact to be determined under [Evidence Code] section 405. [Citation.] The test imposed is an objective one— would the statement subject its declarant to criminal liability such that a reasonable person would not have made the statement without believing it true." (*People v. Jackson* (1991) 235 Cal.App.3d 1670, 1678, fn. omitted.)

The first element of admissibility under Evidence Code section 1230 was established—the trial court found Aguilar was unavailable as a witness. However, as the trial court pointed out, there was no evidence that Aguilar actually possessed a gun when he asked if Mays was interested in purchasing a gun. For a statement to be admissible under Evidence Code section 1230, it must be "'*distinctly*' against the declarant's penal

---

[4] "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.)

interest," not just possibly against his interest. (*People v. Jackson*, *supra*, 235 Cal.App.3d at p. 1677, italics added.)

Moreover, even if Aguilar did possess a firearm at the time of his conversation with Mays, there was no evidence it was the same firearm found in defendant's car one or two months later. We conclude the trial court did not abuse its discretion in excluding Mays's testimony about his conversation with Aguilar.

**B. Denial of Motion to Suppress Evidence Found in Defendant's Vehicle**

Defendant contends the trial court erred in denying his motion under section 1538.5 to suppress the evidence of the firearm found in his vehicle because he had a reasonable expectation of privacy in the contents of the searched vehicle, and the scope of the search exceeded the parameters of a legitimate probation search.

*1. Additional Background*

Defendant moved before trial to suppress evidence seized from his vehicle following the traffic stop and evidence later seized from his motel room. Officer Traynham testified that he conducted the traffic stop of defendant's vehicle about 9:32 p.m. on October 22, 2010, because a brake light was out. Defendant was driving, and Aguilar was sitting in the front passenger seat. Both defendant and Aguilar identified themselves, and the officer conducted a records check of them. He learned that Aguilar was on felony probation with "full search terms." Officer Traynham testified he believed that meant "immediate search of the person, anything he's in control of, whether it is his place of residency, vehicle, . . . anything he's in immediate control of." The officer

8

informed defendant and Aguilar that he was going to search the area where Aguilar was sitting, and defendant protested. The officer asked defendant to get out of the vehicle, asked if he had any illegal weapons, and searched defendant's person after obtaining his permission to do so. Meanwhile, the officer learned that Aguilar had a felony warrant for his arrest; Aguilar was taken into custody and placed in the patrol car.

Officer Traynham searched the front passenger area of defendant's car where Aguilar had been sitting, including the glove box and center console. In the center console, he found a Ruger revolver. The officer testified, based on his training and experience, that he believed Aguilar might have put something in the center console because it was a high crime area, Aguilar was on probation and had a felony warrant for drugs, and Aguilar likely realized the chance of his getting searched was high.

Officer Patrick Biggers testified that on October 28, 2010, he had executed a search warrant on defendant's motel room. He had obtained the warrant "to look for further evidence of the handgun that Officer Traynham found in [defendant's] vehicle." The officers found several hundred rounds of ammunition of various calibers in the room; some of the ammunition would fit the handgun found in defendant's car. The ammunition was found in a dresser drawer and on top of a television stand. The officers found "one or two items of dominion" that indicated defendant lived there, and they also found one letter belonging to Aguilar. Officer Biggers arrested defendant for possession of the ammunition. Defendant agreed to speak to the officer after receiving his *Miranda* admonitions. He told the officer "he didn't know that it was illegal for him to possess the

9

ammunition and that he didn't believe that . . . he would be charged with possession of the gun based on the ammunition, because his friend, Mr. Aguilar, who was in the car, had agreed to take responsibility for the gun."

### 2, Analysis

We review challenges to the admissibility of evidence obtained by a police search and seizure under federal constitutional standards. (*People v. Schmitz* (2012) 55 Cal.4th 909, 916.) "A warrantless search is unreasonable under the Fourth Amendment unless it is conducted pursuant to one of the few narrowly drawn exceptions to the constitutional requirement of a warrant. [Citations.] California's parole search clause is one of those exceptions." (*Ibid.*) In *Schmitz*, the court addressed "the permissible scope of a parole search that infringes on the privacy of a third party driving a car with a parolee passenger," including "the permissible scope of the search of the car's interior" and "the permissible scope of a search of property located in the car." (*Id.* at p. 917.) The court held that "a vehicle search based on a passenger's parole status may extend beyond the parolee's person and the seat he or she occupies. Such a search is not without limits, however. The scope of the search is confined to those areas of the passenger compartment where the officer reasonably expects that the parolee could have stowed personal belongings or discarded items when aware of police activity. Within these limits, the officer need not articulate specific facts indicating that the parolee has *actually* placed property or contraband in a particular location in the passenger compartment before searching that area. Such facts are not required because the parole search clause

10

explicitly authorizes a search 'without cause.'" (*Id.* at p. 926, fn. omitted.) The court noted, however, that the facts did not involve "a search of closed compartments of the car like the glove box, center console, or trunk," and the court "express[ed] no opinion on whether a search of such closed-off areas could be based solely on a passenger's parole status. The reasonableness of such a search must necessarily take into account all the attendant circumstances, including the driver's legitimate expectation of privacy in those closed compartments, the passenger's proximity to them, and whether they were locked or otherwise secured." (*Id.* at p. 926, fn. 16.) The court further stated there was "no . . . reason to limit a parole search to the area within the parolee's reach *at the moment of the search.* [Rather], an officer has a compelling interest in detecting criminal activity by a parolee regardless of whether the parolee has been safely removed from the car and secured." (*Id.* at pp. 927-928, fn. 19.)

Because *Schmitz* dealt with a parole search rather than a probation search and because the court expressly did not address the search of a closed compartment within a vehicle, the case provides only general guidance rather than a direct resolution of the issue before us. In *People v. Baker* (2008) 164 Cal.App.4th 1152, 1159, the court stated the following principles: "When executing a parole or probation search, the searching officer may look into closed containers that he or she reasonably believes are in the complete or joint control of the parolee or probationer. [Citations.] This is true because the need to supervise those who have consented to probationary or parolee searches must be balanced against the reasonable privacy expectations of those who reside with, ride

11

with, or otherwise associate with parolees or probationers. . . . While those who associate with parolees or probationers must assume the risk that when they share ownership or possession with a parolee or probationer their privacy in these items might be violated, they do not abdicate all expectations of privacy in all personal property. The key question remains: whether there is joint ownership, control, or possession over the searched item with the parolee or probationer. [Citations.]"

We conclude the officer properly searched the center console as part of his valid probation search of Aguilar. The center console was under the control of and easily accessible to both defendant and Aguilar, defendant's front seat passenger. Indeed, defendant's primary defense, that the handgun found in the console belonged to Aguilar, fundamentally depended on Aguilar's having joint control of the console. The trial court did not err in admitting into evidence the gun found during that search.

### C. Denial of Motion to Suppress Evidence Found in Defendant's Motel Room

Defendant next contends the trial court erred in failing to traverse the search warrant and suppress evidence of the ammunition found in his motel room because the search warrant affidavit was based on the illegally obtained evidence found in his car, or, in the alternative, he was denied effective assistance of counsel because his counsel failed to move to suppress evidence of the ammunition. Because we have concluded that the evidence found in his car was legally obtained, we reject both contentions.

12

### D. Denial of Motion for New Trial

Defendant contends the trial court erred in denying the motion for a new trial based on newly discovered evidence that a third party had confessed to possessing the firearm and ammunition.

#### 1. Additional Background

Defendant moved for a new trial on the ground of newly discovered evidence. In support of the motion, defendant submitted the declaration of Jesus Cruz Valenzuela. The declaration stated that Valenzuela had been in custody in the Indio jail and had been housed for three months with Aguilar. Aguilar told Valenzuela details of his and defendant's arrest and the charges pending against defendant. Aguilar "specifically said to [Valenzuela] that the firearm located by police in the center console of [defendant's] car belong[ed] to him, Mr. Aguilar. He said further that when the police initiated the traffic stop, it was his intention to run. He informed [defendant] that he was going to run. [Defendant] told him not to run. He then told [defendant] that and said, 'But I got this,' indicating the gun. Mr. Aguilar then placed the gun . . . in the center console before the police officer approached the vehicle."

Valenzuela further declared that Aguilar said that "the ammunition from the motel room also belonged to him." Aguilar expected defendant to bail him out, and when defendant failed to do so after several weeks, Aguilar "became frustrated, and decided he had no reason to own up to the gun and ammunition possession charges because

13

[defendant] was the only one charged." Aguilar told Valenzuela that he had obtained the weapon in exchange for a tattoo he had done for someone.

Valenzuela was represented by the same attorney as defendant and performed yard work for the attorney after being released from custody in March 2011. On May 8, 2011, Valenzuela asked the attorney about defendant's case and learned that the jury had found defendant guilty. Valenzuela "then told [the attorney] about [his] jail contacts with Mr. Aguilar, and the statements Mr. Aguilar made about his role in the incidents."

Following a hearing, the trial court denied the motion.

### 2. Standard of Review

This court reviews the trial court's ruling on a motion for new trial under the deferential abuse of discretion standard. (*People v. Howard* (2010) 51 Cal.4th 15, 43.)

### 3. Analysis

The trial court may grant a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (§ 1181, cl. (8).) "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: "'1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits.'" [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th

14

312, 328.)  The trial court may consider the credibility of the evidence was well as its materiality in determining whether introducing the evidence in a new trial would make a different result reasonably probable.  (*People v. Howard*, *supra*, 51 Cal.4th at p. 43.)

Assuming for purposes of argument that the evidence was newly discovered and could not with reasonable diligence have been discovered earlier and produced at trial, the trial court nonetheless found that Valenzuela's declaration was not credible, and moreover, it was inconsistent with stronger evidence that supported the verdict. Specifically, the trial court found that Valenzuela's declaration was inconsistent with Diego's trial testimony that defendant admitted the gun was his, with police testimony that defendant admitted the ammunition was his, and with defendant's history of firearms that undermined any suggestion that defendant would have had no idea there was a significant amount of ammunition in the small motel room.  Thus, the trial court found it not reasonably probable that a new trial would yield a different result.

We conclude the trial court did not abuse its discretion in denying the motion for new trial.

### E.  Effect of Recent Amendments to Three Strikes Laws

Defendant contends his sentence should be vacated and the case remanded for resentencing under the recently enacted Proposition 36, the Three Strikes Reform Act of 2012 (the Reform Act).  Relying on *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), defendant contends he is entitled to resentencing because his convictions are not yet final and the Reform Act provides for reduced punishment.  The People oppose the request,

15

arguing that the Reform Act allows persons like defendant, who are presently serving an indeterminate sentence but whose sentence under the act would not have been an indeterminate sentence, to file a petition for recall in the trial court.

### 1. Proposition 36

Under the Three Strikes law as it existed before the passage of the Reform Act, a defendant with two or more strike priors who is convicted of any new felony would receive a sentence of 25 years to life. (Former § 667, subd. (e)(2)(A).) As amended, section 667 provides that a defendant who has two or more strike priors is to be sentenced pursuant to paragraph 1 of section 667, subdivision (e)—i.e., as though the defendant had only one strike prior—if the current offense is not a serious or violent felony as defined in section 667.5, subdivision (c) or section 1192.7, subdivision (c), unless certain disqualifying factors are pleaded and proven.[5] (§§ 667, subds. (d)(1), (e)(2)(C).)

---

[5] Section 667, subd. (e)(2)(C) provides that second strike sentencing does not apply if the prosecution pleads and proves any of the following:

"(i) The current offense is a controlled substance charge, in which an allegation under Section 11370.4 or 11379.8 of the Health and Safety Code was admitted or found true.

"(ii) The current offense is a felony sex offense, defined in subdivision (d) of Section 261.5 or Section 262, or any felony offense that results in mandatory registration as a sex offender pursuant to subdivision (c) of Section 290 except for violations of Sections 266 and 285, paragraph (1) of subdivision (b) and subdivision (e) of Section 286, paragraph (1) of subdivision (b) and subdivision (e) of Section 288a, Section 311.11, and Section 314.

"(iii) During the commission of the current offense, the defendant used a firearm, was armed with a firearm or deadly weapon, or intended to cause great bodily injury to another person.

"(iv) The defendant suffered a prior serious and/or violent felony conviction, as defined in subdivision (d) of this section, for any of the following felonies:

"(I) A 'sexually violent offense' as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code.

*[footnote continued on next page]*

16

The Reform Act also provides a procedure that allows a person who is "presently serving" an indeterminate life sentence imposed pursuant to the Three Strikes law to petition to have his or her sentence recalled and to be sentenced as a second strike offender, if the current offense is not a serious or violent felony and the person is not otherwise disqualified.  The trial court may deny the petition even if those criteria are met, if the court determines that resentencing would pose an unreasonable risk of danger to public safety.  (§ 1170.126, subds. (a)-(g).)  Accordingly, under section 1170.126, resentencing is discretionary even if the defendant meets the objective criteria (§ 1170.126, subds. (f), (g)), while sentencing under section 667, subdivision (e)(2)(C) is mandatory, if the defendant meets the objective criteria.

---

*[footnote continued from previous page]*

"(II) Oral copulation with a child who is under 14 years of age, and who is more than 10 years younger than he or she as defined by Section 288a, sodomy with another person who is under 14 years of age and more than 10 years younger than he or she as defined by Section 286, or sexual penetration with another person who is under 14 years of age, and who is more than 10 years younger than he or she, as defined by Section 289.
"(III) A lewd or lascivious act involving a child under 14 years of age, in violation of Section 288.
"(IV) Any homicide offense, including any attempted homicide offense, defined in Sections 187 to 191.5, inclusive.
"(V) Solicitation to commit murder as defined in Section 653f.
"(VI) Assault with a machine gun on a peace officer or firefighter, as defined in paragraph (3) of subdivision (d) of Section 245.
"(VII) Possession of a weapon of mass destruction, as defined in paragraph (1) of subdivision (a) of Section 11418.
"(VIII) Any serious and/or violent felony offense punishable in California by life imprisonment or death."

Had defendant been sentenced under the new version of the law, he would have received a sentence of double the determinate term for his conviction of possessing cocaine for sale. (§ 667, subds. (e)(1) & (e)(2)(C).) Defendant contends section 667, subdivision (e)(2)(C) is an ameliorative sentencing statute which presumptively applies to all criminal judgments which were not yet final as of its effective date, and that there is nothing in the language of the Reform Act which overcomes the presumption.

*2. Section 667, subdivision (e)(2)(C) Applies to Defendants Whose Judgments Were Not Yet Final on the Effective Date of the Reform Act.*

There is a general rule of statutory construction, embodied in section 3 of the Penal Code, that "'when there is nothing to indicate a contrary intent in a statute it will be presumed that the Legislature intended the statute to operate prospectively and not retroactively.' [Citation.]" (*People v. Floyd* (2003) 31 Cal.4th 179, 184 (*Floyd*).) In *Estrada*, *supra*, 63 Cal.2d 740, the California Supreme Court created a limited exception to that presumption. In that case, the court held that where a statute has been amended to lessen the punishment for an offense and there is no clear indication of an intent to apply the amendment prospectively only, it must be presumed that the Legislature intended the mitigated punishment to apply to all judgments not yet final as of the effective date of the amended statute. (*Id.* at pp. 744-747.) The court held: "'A legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law.'" (*Id*. at 745.) From this, "[i]t is an inevitable inference that the Legislature must have

18

intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply," including those which are not yet final.  (*Ibid*.)

The Legislature has never abrogated the *Estrada* rule.  (See *People v. Nasalga* (1996) 12 Cal.4th 784, 792, fn. 7 (*Nasalga*).)  The rule and its continued vitality were most recently discussed by the California Supreme Court in *People v. Brown* (2012) 54 Cal.4th 314 (*Brown*).)  In *Brown*, the court reiterated that *Estrada* "is today properly understood, not as weakening or modifying the default rule of prospective operation codified in section 3, but rather as informing the rule's application in a specific context by *articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments.*"  (*Brown*, *supra*, at p. 324, italics added.)

Despite the *Estrada* presumption, however, a court interpreting a statute that ameliorates punishment must nevertheless determine the intent of the Legislature or of the electorate in enacting the statute.  (*Floyd*, *supra*, 31 Cal.4th at p. 184.)  To determine intent, courts look first to the language of the provision, giving its words their ordinary meaning.  If that language is clear in relation to the problem at hand, there is no need to go further.  (*Ibid*.)  If the language is not clear, the tools of statutory construction must be applied, including but not limited to the *Estrada* rule.  If necessary, the court must also look to other extrinsic indicators of intention.  (*Nasalga*, *supra*, 12 Cal.4th at p. 794.)

19

There is no question that section 667, subdivision (e)(2)(C) is an amendment which ameliorates punishment under the Three Strikes law for those defendants who meet its criteria. However, the Reform Act does not contain any explicit provision for retroactive or prospective application, and it does not explicitly state what remedy—i.e., section 667, subdivision (e)(2)(C) or section 1170.126—applies to a person in defendant's position. Consequently, we must "look for any other indications" to determine and give effect to the intent of the electorate. (*Nasalga*, *supra*, 12 Cal.4th at p. 794.)

In enacting new laws, both the Legislature and the electorate are "presumed to be aware of existing laws and judicial construction thereof." (*In re Lance W.* (1985) 37 Cal.3d 873, 890, fn. 11.) Accordingly, we presume that in enacting the Reform Act, the electorate was aware of the *Estrada* presumption that a law ameliorating punishment applies to all judgments not yet final on appeal on the effective date of the new statute. We also presume the electorate was aware that a saving clause may be employed to make it explicit that the amendment is to apply prospectively only, and that in the absence of a saving clause or another clear signal of intent to apply the amendment prospectively, the statute is presumed to apply to all nonfinal judgments. (*Nasalga*, *supra*, 12 Cal.4th at p. 793; *Estrada*, *supra*, 63 Cal.2d at p. 747.) Previous ballot initiatives have employed explicit language making an ameliorative statute prospective. For example, the California Supreme Court held that the previous Proposition 36, approved by voters on November 7, 2000, applied prospectively only, despite its ameliorative effect, because it

20

expressly stated, "'Except as otherwise provided, the provisions of this act shall become effective July 1, 2001, and its provisions shall be applied prospectively.' [Citations.]" (*Floyd*, *supra*, 31 Cal.4th at pp. 183-185.) The court in *Floyd* held that the plain language of this saving clause trumped any other possible interpretation of the proposition. (*Id*. at pp. 185-187.) In the Reform Act, in contrast, the absence of such language is persuasive evidence that the electorate did intend to apply section 667, subdivision (e)(2)(C) to nonfinal judgments.

This construction, moreover, is fully consistent with the expressed purposes of the Reform Act. In *Floyd*, *supra*, 31 Cal.4th at pages 187 through 188, the court found further support in the ballot arguments in support of the proposition, which stated that "'[i]f Proposition 36 passes, nonviolent drug offenders *convicted for the first or second time after 7/1/2000*, will get mandatory, court-supervised treatment instead of jail.' (Ballot Pamp., Gen. Elec. (Nov. 7, 2000) argument in favor of Prop. 36, p. 26 . . . ." (Italics added.) The ballot arguments in support of the Reform Act stated that its purpose was to ensure that "[p]recious financial and law enforcement resources" were not diverted to impose life sentences for some nonviolent offenses, while assuring that violent repeat offenders are effectively punished and not released early. The proponents stated that the act would "help stop clogging overcrowded prisons with non-violent offenders, so we have room to keep violent felons off the streets" and "help[] ensure that prisons can keep dangerous criminals behind bars for life." An additional purpose was to save taxpayers "$100 million every year" by ending wasteful spending on housing and

21

health care costs for "non-violent Three Strikes inmates." Moreover, the act would ensure adequate punishment of nonviolent repeat offenders by doubling their state prison sentences. The proponents pointed out that dangerous criminals were being released early because "jails are overcrowded with nonviolent offenders who pose no risk to the public." And, the proponents stated that by passing Proposition 36, "California will retain the toughest recidivist Three Strikes law in the country but will be fairer by emphasizing proportionality in sentencing and will provide for more evenhanded application of this important law." The proponents pointed out that "[p]eople convicted of shoplifting a pair of socks, stealing bread or baby formula don't deserve life sentences." (Voter Information Guide, Gen. Elec. (Nov. 6, 2012) argument in favor of Prop. 36 and rebuttal to argument against Prop. 36, <http://voterguide.sos.ca.gov/ propositions/36/ arguments-rebuttals.htm> [as of September 9, 2013].) Applying section 667, subdivision (e)(2)(C) to nonfinal judgments is wholly consistent with these objectives, in that doing so would enhance the monetary savings projected by the proponents and would further serve the purposes of reducing the number of nonviolent offenders in prison populations and of reserving the harshest punishment for recidivists with current convictions for serious or violent felonies, while still assuring public safety by imposing doubled prison terms on less serious repeat offenders.

For both of these reasons—the absence of any expressed intent to apply the act prospectively only and the stated intent underlying the proposition—we conclude that

22

section 667, subdivision (e)(2)(C) applies to judgments which were not final as of its effective date.

The first published appellate decision that addresses this issue is *People v. Yearwood* (2013) 213 Cal.App.4th 161 (*Yearwood*). In *Yearwood*, as in this case, the defendant would have been entitled to second strike sentencing under the Reform Act if he had been sentenced initially after the effective date of the Reform Act. He had already been sentenced and his appeal was pending on the date the act became effective. The court held that even though the judgment was not yet final, Yearwood's only remedy was to petition for recall of his sentence and for resentencing pursuant to section 1170.126. (*Yearwood*, *supra*, at pp. 167, 168, 169.)

The court concluded, as we have, that the Reform Act does not contain a saving clause or refer to retroactive or prospective application or refer explicitly to persons in Yearwood's position. Nevertheless, the court held, section 1170.126 unambiguously applies to prisoners whose judgments were not final on the Reform Act's effective date, because those prisoners were "presently serving" an indeterminate life term under the Three Strikes law. (See § 1170.126, subd. (a).) The court further held that section 1170.126 therefore effectively operates as the functional equivalent of a saving clause and, if section 667, subdivision (e)(2)(C) is read not in isolation but in the context of the entire statutory scheme, it is clear that the mandatory sentencing provision of section 667, subdivision (e)(2)(C) is intended to operate prospectively only. (*Yearwood*, *supra*, 213 Cal.App.4th at p. 175.)

23

*Yearwood* is correct that even in the absence of an express saving clause there may be other reasons to determine that the enacting body intended the statute to apply prospectively only. *Brown*, *supra*, 54 Cal.4th 314, provides an example. In that case, the court held that an amendment to section 4019, which increased the rate at which prisoners may earn credits for good behavior, applied prospectively only, despite the absence of express language to that effect, because the purpose of section 4019 is to provide an incentive for good behavior during incarceration. Accordingly, rather than reflecting a determination that a reduced penalty for *past* criminal conduct satisfies the legitimate ends of criminal law, section 4019 addresses "*future conduct* in a custodial setting by providing increased incentives for good behavior." (*Brown*, *supra*, at p. 325.) Awarding the credit retroactively, for time spent in custody before the effective date of the amendment, would not further that purpose. Consequently, the court held, there is no logical basis for inferring that the Legislature intended the amended statute to apply retroactively, and the *Estrada* rule does not apply. (*Brown*, *supra*, at p. 325 & fn. 15.) The same is not true of the Reform Act, however. As we discussed above, retroactive application of section 667, subdivision (e)(2)(C) is consistent with the proponents' stated objectives of reducing prison overcrowding, reducing the resources expended on third strike offenders whose current and prior offenses are nonviolent and less serious, and enhancing public safety by ensuring that the truly dangerous repeat offenders serve indeterminate life terms. Accordingly, there is a logical basis for inferring that the electorate intended the amendment to apply to nonfinal judgments.

24

Moreover, we do not agree with *Yearwood* that section 1170.126 unambiguously applies to defendants who were serving nonfinal third strike sentences on the effective date of the Reform Act. In light of the *Estrada* presumption and the absence of a saving clause in section 667, subdivision (e)(2)(C), the provision that section 1170.126, subdivision (a) applies "exclusively to persons presently serving" a third strike sentence *is* ambiguous—does it refer only to prisoners serving sentences that are final, or does it include those whose judgments are not final? It is certainly not so clear as to qualify as the functional equivalent of a saving clause. In *Nasalga*, *supra*, 12 Cal.4th 784, the California Supreme Court held that the rule of *Estrada* is "not implicated where the Legislature *clearly signals* its intent" to make an amendment prospective, "by the inclusion of either an express saving clause or its equivalent." (*Nasalga*, *supra*, at p. 793, italics added.) The court did not describe what constitutes an "equivalent" to an express saving clause. However, the court stated that in the absence of an express saving clause, the "'quest for legislative intent'" requires that "'the Legislature demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.' [Citation.]" (*Ibid*.) In our opinion, the statutory language that *Yearwood* relies on does not meet that requirement because it is ambiguous. We note, too, that *Yearwood* does not cite a single case in which similarly ambiguous language was deemed to be the equivalent of a saving clause.

*Yearwood* finds support for its position in the ballot arguments in favor of the Reform Act. It points out that enhancing public safety was a key purpose of the act.

25

(*Yearwood*, *supra*, 213 Cal.App.4th at p. 175.)  The court states that giving section 667, subdivision (e)(2)(C) prospective-only application furthers that purpose by reducing the likelihood that prisoners who are currently dangerous will be released from prison under the Reform Act.  In contrast with section 1170.126, section 667, subdivision (e)(2)(C) does not provide the court with discretion to impose a third strike sentence if it finds that the defendant poses an "unreasonable risk of danger to public safety."  (§ 1170.126, subd. (f).)  *Yearwood* points out that several years may elapse between sentencing and finality, and a defendant who might objectively qualify for second strike sentencing under section 667, subdivision (e)(2)(C) may have shown himself or herself to pose such a risk by misconduct during postsentencing incarceration.  (*Yearwood*, *supra*, at pp. 175-176.)

This is arguably a valid concern.  However, it is not reflected in the ballot arguments in support of the Reform Act.  We cannot say that a concern not expressed in a ballot argument is a clear indication of voter intent, no matter how valid the concern may be.  Moreover, a defendant may also be incarcerated for many months before being convicted and sentenced for a third strike offense.  Such a defendant may also display a propensity for violence or other conduct while incarcerated, which indicates that he or she poses a risk to public safety.  Nevertheless, any qualifying defendant convicted and sentenced after the effective date of the Reform Act is entitled to sentencing under section 667, subdivision (e)(2)(C), and the trial court has no discretion to impose a third strike sentence even if the court has concerns about the defendant's future dangerousness

26

for any reason, including the defendant's conduct while in custody.  For this reason as well, we do not find *Yearwood*'s analysis persuasive.

### 3.  Conclusion

We conclude that in passing the Three Strikes Reform Act of 2012, the electorate intended the mandatory sentencing provision of sections 667, subdivision (e)(2)(C) and 1170.12, subdivision (c)(2)(C) to apply to qualifying defendants whose judgments were not yet final on the effective date of the act.  Hence, we vacate defendant's sentence and remand the matter to the trial court for resentencing.

### F.  Cruel and Unusual Punishment

Defendant contends his sentence of life imprisonment was cruel and unusual punishment.  Because we vacate defendant's sentence and remand for resentencing, defendant's constitutional challenge to his punishment is moot.

## IV.  DISPOSITION

The determination of guilt is affirmed, but the sentence is vacated and the matter is remanded for resentencing under section 667, subdivision (e)(2)(C) and/or section 1170.12, subdivision (c)(2)(C).

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


                                            HOLLENHORST
                                                        Acting P. J.
I concur:

        MCKINSTER
                                J.

27

MILLER, J., Concurring and Dissenting.

I respectfully dissent on the issue of defendant's sentence being vacated pursuant to the Three Strikes Reform Act of 2012 (the "Reform Act"). In all other aspects, I concur with the majority's opinion. The interpretation of the Reform Act set forth in *People v. Yearwood* (2013) 213 Cal.App.4th 161 (*Yearwood*) reflects the plain meaning of the Reform Act's language. In *Yearwood*, the Court of Appeal concluded the Reform Act was intended to apply prospectively only and, therefore, people who were sentenced prior to the effective date of the Reform Act, but whose cases were pending appeal after the Reform Act became effective, could not automatically be resentenced (*id.* at p. 168); rather, they would have to petition the trial court for a reduced sentence (*id.* at p. 179).

In *In re Estrada* (1965) 63 Cal.2d 740, the court held that where a statute has been amended to lessen the punishment for an offense and there is no clear indication of an intent to apply the amendment prospectively only, it must be presumed that the Legislature intended the mitigated punishment to apply to all judgments not yet final as of the effective date of the amended statute. (*Id*. at pp. 744-747.) In *Yearwood*, the appellate court concluded the *Estrada* rule is inapplicable to the Reform Act because the Reform Act's language is unambiguous, in that "voters intended a petition for recall of sentence to be the sole remedy available under the Act for prisoners who were serving an indeterminate life sentence imposed under the former three strikes law on the Act's effective date without regard to the finality of the judgment." (*Yearwood*, *supra*, 213 Cal.App.4th at p. 172.)

1

I agree with the *Yearwood* opinion, in that the language of the Reform Act is unambiguous and reflects an intent on the part of the electorate to have the law apply prospectively only, thus making the *Estrada* rule inapplicable. I focus on the portion of Proposition 36, which set forth: "[*a*]*ny person* serving an indeterminate term . . . may file a petition for a recall of sentence, within two years after the effective date of the act . . . ."[1] (Italics added.) Given the "any person" language, it appears the electorate intended for all people who were already committed to custody to proceed solely via the petition process, not through appellate requests for vacated sentences and automatic resentencing. (See *People v. Alanis* (2008) 158 Cal.App.4th 1467, 1475-1476 [a defendant's sentence commences after being sentenced by the trial court when s/he is committed to custody]; see also *People v. Howard* (1997) 16 Cal.4th 1081, 1087-1088 [discussing the difference between pre-commitment and post-commitment time periods].)

Thus, I conclude the *Yearwood* opinion is correct, in that the plain language of the Reform Act makes it a prospective-only statute. Therefore, the Reform Act does not provide defendant with automatic resentencing—he would need to petition the trial court for a reduced sentence.

MILLER

J.

---

[1] http://vig.cdn.sos.ca.gov/2012/general/pdf/text-proposed-laws-v2.pdf#nameddest=prop36, as of October 30, 2013.